IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>RACHEL LENAGH,  )<br>)<br>Defendant.  )<br>_____ ) | 8:07CR346<br><br>SENTENCING MEMORANDUM |

This Sentencing Memorandum supplements findings made on the record at defendant's sentencing hearing on January 23, 2009.

**I. BACKGROUND**

Defendant was charged with conspiracy to commit health care fraud in violation of 18 U.S.C. § 371. The offense carries a maximum term of imprisonment of five years. Pursuant to a plea agreement, Lenagh entered a plea of guilty to the charge. Filing No. 50, Plea Agreement; Filing No. 47, Test Minute Entry. The plea agreement contemplated cooperation by Lenagh and provided that any cooperation would be considered by the United States Attorney in moving for a sentence reduction under United States Sentencing Guidelines ("U.S.S.G.") § 5K1.1, 18 U.S.C. 3553(e), and/or, Fed. R. Crim. P. 35(b) and agreed to bring the defendant's cooperation to the attention of the court for the purpose of determining an appropriate sentence. Filing No. 50, Plea Agreement at 2-3. The government also agreed to move for a three-level offense level reduction for acceptance of responsibility under United States Sentencing Guidelines (U.S.S.G.) § 3E1.1(a). *Id.* at 1. The parties agreed to an amount of loss of $1.4 million and a base offense level of 22

8:07-cr-00346-JFB-TDT   Doc # 64   Filed: 02/06/09   Page 2 of 13 - Page ID # 179

under U.S.S.G. § 2B1.1. *Id.* at 4. The partes further agreed that the defendant should receive a two-level increase for abuse of a position of public or private trust, pursuant to U.S.S.G. § 3B1.3. *Id.* The court accepted the defendant's plea but deferred acceptance of the plea agreement pending the preparation of a Presentence Investigation Report (hereinafter, "PSR") by the United States Office of Probation (hereinafter, "the Probation Office") that calculated the defendant's sentence under the United States Sentencing Guidelines ("the Guidelines").

In the PSR, the Probation Office identified U.S.S.G. § 2B1.1 as the applicable Guidelines base offense level provision and determined that the defendant's base offense level should be 6. Filing No. 62, PSR (sealed) at 13. It added a 16-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I) for an amount of loss of more than $1 million but less than $2.5 million and a two-level increase because the offense involved sophisticated means under U.S.S.G. § 2B1.1(b)(9)(C). *Id.* at 13-14. It also added a two-level increase for Ms. Lenagh's role in the offense as one who "abused a position of public trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense" under U.S.S.G. § 3B1.3. *Id.* at 14. It then subtracted three levels for the defendant's acceptance of responsibility under U.S.S.G. § 3E1.1 (a) & (b), resulting in a total offense level of 23. *Id.* The defendant has no prior convictions or other criminal conduct and her criminal history category is I. *Id.* at 15. At criminal history category I and base offense level 23, Lenagh's sentencing range under the Guidelines is 46 to 57 months.

The following facts are set out in the PSR. *See* Filing No. 62, PSR (sealed). Ms. Lenagh is 40 years old. She has a high school education. She has been diagnosed with adjustment reaction disorder with mixed emotional features and dependent personality

disorder with obsessive and schizoid features. She was employed as a claims processor at Mutual of Omaha ("Omaha"). She became involved in the scheme to fraudulently process healthcare claims through her co-defendant, Sharon Johnson. The scheme was instigated by Johnson, who at one time was insured by Mutual. Johnson befriended Lenagh over the phone when Johnson called to inquire about claims. The two women never met. Lenagh began to process claims sent by Johnson. Lenagh reported that Johnson would send her small gifts as well as cards and presents at Christmas. Johnson also called Lenagh just to see how Lenagh was doing or to tell jokes. At some point, Lenagh discovered that the claims Johnson had been submitting were fraudulent. In January 2006, Johnson sent Lenagh $30,000, claiming the money was from Johnson's father's estate. Lenagh stated she would repay Johnson, but Johnson told her it would not be necessary if Lenagh would continue to process the claims even though Johnson's policy had expired. Johnson threatened to expose Lenagh to her employer.

Lenagh objected to the assessment of a two-level enhancement for use of "sophisticated means" in the commission of the offense. Filing No. 53. At the sentencing hearing, she also moved for a downward departure by reason of mental illness or for a sentence outside the Guidelines.

## II. DISCUSSION

### A. Law

The Sentencing Guidelines are no longer mandatory. *United States v. Booker,* 543 U.S. 220, 260-61 (2005). In *Booker,* the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment. *Booker,* 543 U.S. at 226-27. In the *Booker* remedial opinion, the Supreme Court determined that the constitutional

violation would be cured by modifying the federal sentencing statute to make the Guidelines effectively advisory. *Id.* at 245. Consequently, the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *Gall v. United States,* 552 U.S. —, —, 128 S. Ct. 586, 602 (2007) (finding a sentence outside the Guidelines to be reasonable); *Kimbrough v. United States,* 552 U.S. —, —, 128 S. Ct. 558, 570 (2007) (noting that courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines); *Rita v. United States,* 551 U.S. —, —, 127 S. Ct. 2456, 2465 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); *Cunningham v. California,* 549 U.S. 270, —, 127 S. Ct. 856, 867 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines but are obliged to "take account of" that range along with the sentencing goals Congress enumerated in 18 U.S.C. § 3553(a) of the Sentencing Reform Act). District courts must therefore "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough*, 552 U.S. at —, 128 S. Ct. at 570 (*quoting Booker,* 543 U.S. at 245-246); *Gall,* — U.S. at —, 128 S. Ct. at 596 (stating "[t]he Guidelines are not the only consideration, the district judge should consider all of the § 3553(a) factors"). These cases "mean that the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 577 (Scalia, J., concurring); *see also Spears v. United States,* — S. Ct. —, —, 2009 WL 129044, *2 (Jan. 21, 2009)(per curiam) (recognizing the district courts' authority to vary from Guidelines

4

based on policy disagreement, and not simply based on an individualized determination that they yield an excessive sentence in a particular case).

The Sentencing Reform Act "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 570 *(quoting* 18 U.S.C. § 3553(a)). The statute further provides that "in determining the appropriate sentence, the court should consider a number of factors, including 'the nature and circumstances of the offense,' 'the history and characteristics of the defendant,' 'the sentencing range established' by the Guidelines, 'any pertinent policy statement' issued by the Sentencing Commission pursuant to its statutory authority, and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id. (quoting* 18 U.S.C. § 3553(a)). A sentencing judge has greater familiarity with an individual case and individual defendant than the Commission or the appeals court and is "therefore 'in a superior position to find facts and judge their import under § 3353(a)' in each particular case." *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 574 (*quoting Gall,* 552 U.S. at —, 128 S. Ct. at 597).

Although the Guidelines remain "the starting point and the initial benchmark" in determining a sentence, the district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Gall,* 552 U.S. at —, 128 S. Ct. at 596-97. "[A]fter giving both parties an opportunity to

5

argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.,* 552 U.S. at —, 128 S. Ct. at 596. If the court decides that an outside-Guidelines sentence is warranted, the court must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. *Id.* The Supreme Court rejects, however, the notion that "'extraordinary' circumstances [are required] to justify a sentence outside the Guidelines range" and rejects "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595.

Congress established the Sentencing Commission ("the Commission") "to formulate and constantly refine national sentencing standards," in fulfillment of its important institutional role. *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 57; *Rita v. United States,* 551 U.S. at —, 127 S. Ct. at 2464. When operating within that institutional role, the Sentencing Commission "has the capacity courts lack" and can "'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 574 (*quoting United States v. Pruitt,* 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). In formulating the Guidelines, the Commission developed and used data on past practices and recidivism. *See* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing (Nov. 2004) ("Fifteen-Year Assessment") at 14; U.S.S.G. § 1A.1, intro. comment., pt. A, ¶ 3; *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 567. *Gall,* 552 U.S. at —, 128 S. Ct. at 594 (noting that the Guidelines are "the product of careful study based on extensive empirical

6

evidence derived from the review of thousands of individual sentencing decisions"). Based on these sentencing statistics, the Commission established the offense levels for each crime, linked to a recommended imprisonment range. Fifteen-Year Assessment at 14. Accordingly, in many cases the Guidelines represent a reasonable estimation of a fair sentencing range. *See Kimbrough,* 128 S. Ct. at 574.

For policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar crimes. Fifteen-Year Assessment, Executive Summary at vii, 15, 56 (stating that important considerations led the Commission to depart from past practices for crimes such as fraud); *see also Kimbrough,* 552 U.S. at —, 128 S. Ct. at 567 (regarding drug crimes). The Commission found that its "study of past sentencing practices revealed that in the preguidelines era, sentences for fraud, embezzlement, and tax evasion generally received less severe sentences than did crimes such as larceny or theft, even when the crimes involved similar monetary loss," noting that a "large proportion of fraud, embezzlement, and tax evasion offenders received simple probation." *Id.,* Executive Summary at vii. The Commission sought to correct this past under-punishment of "white collar" crimes, based on its determination that "penalties for some types of crime, such as 'white collar' offenses, were disproportionately low compared to other types of theft involving similar economic losses." *Id.* at 15, 38. Accordingly, the Commission drafted guidelines to reduce the availability of probation and "to ensure a short but definite period of confinement for a larger percentage of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence." *Id.*, Executive Summary at vii. In establishing sentences for

economic offenses, the Commission made the pecuniary loss resulting from the crime a primary consideration in determining sentences. *Id.* at 55.

Further, "[t]he use of imprisonment for economic offenders also has increased steadily throughout the guidelines era." *Id.* The Guidelines for white collar crimes have been influenced by numerous formal statutory directives by Congress. *Id.* at 21-22 n.17. Over the years, Congress mandated adjustments of increasing severity to the Guidelines fraud sentences. *Id.* at 56; *see, e.g.,* Pub. 17 L. No. 103-322, § 250003, 108 Stat. 1796 (Sept. 13, 1994) (directing the Commission to review and, if necessary, amend the guidelines to ensure that sentence enhancements for frauds committed against the elderly were adequate); U.S.S.G. Manual, App. B (listing additional aggravating adjustments to the fraud Guidelines); U.S.S.G., App. C, Amend. 617 (Nov. 1, 2001) (amendments under the "economic crimes package" increased sentences for offenses involving large numbers of victims and larger monetary losses); *see* United States Sentencing Commission, Report to Congress, Increased Penalties under the Sarbanes-Oxley Act of 2002 (January 2003) (amendments significantly increased guideline penalties under U.S.S.G. § 2B1.1 as directed by the Act).

The Guidelines ensure that offenses involving the greatest monetary losses, the use of more sophisticated methods, and other aggravating factors are given imprisonment. *Id.* at 57. Notably, "slightly more than 40 percent of both responding district and circuit court judges also would like greater availability of sentencing options (particularly probation-plus-confinement or "split" sentences) for theft and fraud offenses." *Id.*, Summary Report on the U.S. Sentencing Commission's Survey of Article III Judges at 4.

The fairness of the Guidelines is heavily dependent on fair and reasonably consistent charging policies in the Department of Justice. Fifteen-Year Assessment at 23-24. To that end, prosecutors have been directed to "charge and pursue the most serious, readily provable offense or offenses that are supported by the facts of the case, except in limited, enumerated circumstances." *Id.* at 24. Empirical evidence, however, shows that charging and plea bargaining practices continue to introduce significant disparities into the sentencing regime. Fifteen-Year Assessment, Executive Summary at xii; see also Report at 108 (noting that the incarceration of probation-eligible fraud offenders, for example, varied from 17 percent to 38 percent between New Jersey and Pennsylvania, two contiguous districts).

For purposes of the "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(9)(C), "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 n.8. The Guidelines provide the following examples:

> In a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

*Id.* A scheme carried out with "sophisticated means" can be a complex series of fraudulent transactions, a multi-layered plot, or "an elaborate scheme" requiring manipulation of records, fictitious transfers, to the exploitation of numerous individuals. *See, e.g., United States v. Halloran,* 415 F.3d 940, 945 (8th Cir. 2005). The government has the burden of proving by a preponderance of the evidence that an enhancement is warranted. *United States v. Vasquez,* 552 F.3d 734 (8th Cir. 2009).

### B. Analysis

#### 1. Initial Guidelines Calculation

The court finds that the defendant's objection to the two-level enhancement for "sophisticated means" should be sustained. In the plea agreement, the defendant agreed to the amount of loss determination and to an enhancement for abuse of a position of trust or special knowledge, but she did not accede to an enhancement for "sophisticated means." The government bears the burden of proving that the enhancement is applicable. It has not done so. Ms. Lenagh was a claims processor for an insurer, earning $40,000 per year. She has only a high-school education. Ms. Lenagh manually entered claims for reimbursement of either noncovered or nonexistent medical expenses on behalf of her co-defendant, Sharon Johnson, causing the insurer to send Johnson a check. The misconduct was uncovered through an audit triggered by excessive claims. There is nothing complex or elaborate about the conduct. The court finds the government has not shown that the offense was accomplished through the use of "sophisticated means."

The court generally accepts the other facts set forth in the PSR and finds the defendant's base offense level is 6 plus 16 for a loss between $1 million and $2.5 million, plus 2 for abuse of her position, minus 3 for acceptance of responsibility, resulting in a total offense level of 21. At criminal history category I, her sentencing range of imprisonment is 37 to 46 months.

#### 2. Departure

The defendant's motion for departure is more in the nature of a motion for an outside-the-Guidelines sentence and will be discussed below.

### 3. Section 3553 factors

In consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), the court finds that a sentence of 24 months is sufficient, but not greater than necessary to accomplish the goals of sentencing.

With respect to the nature of the offense, the court notes that conspiracy to commit healthcare fraud is undoubtedly a serious offense. Ms. Lenagh's actions cost her employer over a million dollars. However, Lenagh received only $95,000 of the $1.4 million that was embezzled. The facts show Lenagh's co-defendant was the mastermind of the scheme and Lenagh's role was secondary. Nevertheless, the court finds that a sentence including some period of incarceration is necessary to achieve some level of proportionality with respect to other economic crimes such as theft and burglary and to reduce the perception of unwarranted disparity based on socioeconomic status.

The court has also considered the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). Ms. Lenagh is a forty-year-old woman with a high school education. She has been under the treatment of a mental health profession for anxiety. She was diagnosed with an Adjustment Reaction Disorder with Mixed Emotional Features and a Dependent Personality Disorder with Obsessive and Schizoid Features. She was prescribed psychotropic medication and therapy for the condition. Her mental and emotional conditions, including dependent personality disorder, made her a perfect target for exploitation by Johnson. She has never been convicted of any crime and had a solid employment history until she became involved in this offense.

In formulating this sentence, the court has considered the sentencing range established by the Guidelines, but, because the fraud offense Guidelines were

promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines. *See Kimbrough*, 552 U.S. at —, 128 S. Ct. at 574-75. Also, the Guidelines calculation is driven by the amount of loss, which in this case is substantial. Although, as a general rule, the amount of loss or damage is one measure of the seriousness of an offense, and should surely determine the amount of restitution, it is not always a reliable proxy for the culpability of an individual defendant. Lenagh received only $95,000 of the $1.4 million that was embezzled. If she were held responsible for that amount, her base offense level would be 14 and her sentencing range would be 15 to 21 months. To sentence Lenagh as responsible for the total loss would exaggerate her culpability and would not be an accurate measure of her blameworthiness vis-a-vis the other participant in the scheme.

This sentence also satisfies the need to avoid unwarranted sentencing disparities. Johnson was undisputably the mastermind of the operation, and profited to a much greater degree than Lenagh. Johnson has a history of charges and convictions for larceny and similar offenses and it is clear that she exploited Lenagh's vulnerability. To sentence them as equally responsible would exaggerate the defendant's blameworthiness, while downplaying her co-defendant's. Because of her criminal history, Johnson will likely receive a sentence in the neighborhood of 48 months. The court finds that a sentence of half that length for Lenagh fairly reflects the two defendants' relative levels of culpability.

This sentence also satisfies the purposes of sentencing. A sentence of 24 months reflects the seriousness of the offense, promotes respect for the law and provides just punishment. A sentence of 24 months is a significant sentence, especially to an offender

who has never been incarcerated at all.  A sentence including incarceration, as opposed to probation, for this sort of crime will enhance the public's confidence in the criminal justice system.  Also, the defendant has already suffered serious consequences of her crime.  She has lost her job and will suffer the stigma of a felony on her record.  Her prosecution has received considerable publicity.  These factors, along with a significant term of imprisonment, will deter others from engaging in similar criminal conduct.  The value of any additional prison time as a deterrent would be marginal.  The court finds that the defendant is unlikely to reoffend, so this sentence is more than sufficient to protect the public from further crimes.  The need to protect society from further crimes of the defendant is also accounted for in the court's imposition of supervised release.

A Judgment and Commitment and a Statement of Reasons in conformity with this sentencing memorandum will issue this date.

DATED this 6th day of February, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge